UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| v. | ) Crim. No. 94-10287-MLW |
|  | ) |
| 2 – FRANCIS P. SALEMME, | ) Violations: |
| 3 – JAMES J. BULGER, | ) 18 USC 1962(c)(d) |
| 4 – STEPHEN J. FLEMMI, | ) 18 USC 1963 |
| 1 – ROBERT P. DELUCA, and | ) 18 USC 1951 |
| 7 – JAMES M. MARTORANO | ) 18 USC 1952 |
| Defendants. | ) 18 USC 371 |
|  | ) 18 USC 894 |
|  | ) 18 USC 1512 |
|  | ) 18 USC 2 |

## FOURTH SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY in and for the District of
Massachusetts, sitting at Boston, charges that:

### COUNT ONE
### (18 USC §1962(d))

1.  At times material to the allegations contained in this
Indictment:

(a)  Continuously between 1965 and the present there
existed in the District of Massachusetts and elsewhere a secret
criminal organization known by various names, including "La Cosa
Nostra," "Stu Cosa," "The Mafia," "This Thing of Ours," and "This
Thing," which operated throughout the United States through
entities known as "Families," and was ruled on a national level
by a "Commission," traditionally located in New York City,
composed of the heads or "Bosses" of the most powerful Families.

(1)  The Patriarca Family of La Cosa Nostra (the
"Family"), which operated in the Districts of Massachusetts,

(5)   As of October 1989, Raymond J. Patriarca was the Boss of the Family.   The Underboss was Nicholas A. Bianco. Joseph A. Russo was the Consigliere and acted as the Underboss for the Greater Boston area.   The Capo Regimes included Charles Quintina, Vincent M. Ferrara, Robert F. Carrozza, and Biagio DiGiacomo in Boston and Matthew L. Guglielmetti, Jr., in Rhode Island.

(6)   As of 1991, the defendant FRANCIS P. SALEMME was the Boss of the Family.   Charles Quintina was the Consigliere of the Family.   The defendant JAMES M. MARTORANO was a Capo Regime.   The defendant ROBERT P. DELUCA was a Soldier.

(7)   Members and associates were required to obey their superiors in the Family and to commit criminal acts at their direction, including murder.

(8)   Members of the Family shared in the illegal profits of the criminal activity of others and were, in turn, responsible for sharing these illegal profits with their superiors in the Family.

(9)   The Family acted with the purpose of controlling, supervising, financing, and otherwise participating in and deriving income from illegal activities, including illegal gambling, extortion, loansharking, and narcotics distribution businesses and the collection of unlawful debts.

(10)   The Family acted to perpetuate its existence by selecting new leaders and by "making" or "baptizing" new

3

members who had undergone an apprenticeship in crime, had received instructions as to the law and protocol of the Family, and had fulfilled the other requirements of membership.

(b)   Continuously between 1970 and the present there existed in the District of Massachusetts a criminal organization known by various names, including "The Winter Hill Gang" and "South Boston." During the 1970's, this organization was based in Somerville, Massachusetts. Since that time, it has operated from various locations including Boston's West End, South Boston, and Brookline, Massachusetts.

(1)   During the 1970's, Howard T. Winter was the Boss of The Winter Hill Gang. The defendants JAMES J. BULGER, STEPHEN J. FLEMMI, and John Martorano acted in supervisory positions under Winter.

(2)   In approximately 1979, Winter was convicted of racketeering and incarcerated. John Martorano, who was indicted along with Winter, became a fugitive until his apprehension in January 1995. As a result of these events, the defendants JAMES J. BULGER and STEPHEN J. FLEMMI succeeded Winter as the leaders of the Winter Hill Gang.

(3)   The Winter Hill Gang acted with the purpose of controlling, supervising, financing, and otherwise participating in and deriving income from illegal activities, including illegal gambling, extortion, loansharking, and narcotics distribution businesses and the collection of unlawful

4

debts.

    (c)   The defendant FRANCIS P. SALEMME is the boss of the Patriarca Family.  In 1968, SALEMME attempted to murder an attorney, John Fitzgerald, who represented a government witness, Joseph Barboza.  SALEMME also participated in the murders of Edward "Wimpy" Bennett, Walter Bennett, William Bennett and Richard Grasso during 1967.  SALEMME engaged in this criminal activity pursuant to his association with and to further the goals of the Patriarca Family.  SALEMME was a fugitive between approximately 1969 and 1973, when he was apprehended in New York City.  SALEMME was incarcerated until approximately 1988.  Upon SALEMME's release from prison, SALEMME was inducted into the Patriarca LCN Family and became a Soldier or "made" member. SALEMME was the target of an assassination plot when he was shot on June 16, 1989 in Saugus, Massachusetts.  About this time, William Grasso, then Underboss of the Patriarca Family, was assassinated in Connecticut.  Subsequent to June 1989, SALEMME became a Capo Regime in the Patriarca LCN Family.  In approximately 1990, SALEMME was placed in control of Boston by then Patriarca Family Boss Raymond J. Patriarca.  In approximately 1991, SALEMME travelled to New York City where he met with other members of La Cosa Nostra and was elevated to Boss of the Patriarca Family.

    (d)   The defendants JAMES J. BULGER and STEPHEN J.

5

FLEMMI have controlled the Winter Hill Gang since approximately 1979. BULGER, who participated in the organization of the gaming rackets during the 1970's, has often, but not always, acted through intermediaries such as now deceased co-conspirator George Kaufman and the defendant STEPHEN J. FLEMMI since approximately 1979 in order to insulate himself from criminal liability.  The Winter Hill Gang controlled illegal activities in the South Boston neighborhood of Boston primarily through the defendant BULGER who maintained a "crew" or group of associates which operated in South Boston.  Some of the members of this "crew" are known to the grand jury.

(e)  The defendant STEPHEN J. FLEMMI has been a close associate of the defendant FRANCIS P. SALEMME since at least 1967 when FLEMMI participated with the defendant SALEMME in the attempted murder of attorney John Fitzgerald as well as the murders of Edward, Walter, and William Bennett, and Richard Grasso.  FLEMMI, too, was a fugitive between 1969 and 1974.  In approximately 1974, FLEMMI was offered the opportunity to become a "made" member of the Patriarca LCN Family by Raymond L.S. Patriarca.  FLEMMI refused the offer and chose to associate himself with Howard Winter, John Martorano and the defendant BULGER.  However, FLEMMI pledged his own and BULGER'S loyalty to Patriarca.

(f)  John Martorano was one of the leaders of the

6

Winter Hill Gang during the 1970's.  During this period, he operated a large sports bookmaking business on behalf of the Winter Hill Gang and forced "independent" bookmakers to participate in this business.  Martorano became a fugitive in approximately 1979 upon his indictment for racketeering in federal district court.  Although a fugitive, Martorano continued to participate in the activities of the Winter Hill Gang until his apprehension in January 1995.

(g)  Now deceased co-conspirator George Kaufman had been a member of the Winter Hill Gang since the late 1970's. Kaufman collected extortion payments, also known as "rent" payments, from bookmakers and loansharks for BULGER and FLEMMI. Kaufman also acted as a liaison between these loansharks and bookmakers, on the one hand, and BULGER and FLEMMI, on the other hand, regarding the terms of these "rent" payments.  Kaufman's other duties as an intermediary for BULGER and FLEMMI included obtaining authorization from BULGER and FLEMMI to make loans to bookmakers and loansharks in need of financing as well as making arrangements for BULGER and FLEMMI to resolve disputes which arose from these illegal activities.  Finally, Kaufman acted on behalf of John Martorano in Martorano's dealings with certain bookmakers and loansharks.

(h)  Now deceased co-conspirator Francis P. Salemme, Jr. was the son of the defendant FRANCIS P. SALEMME.  Salemme,

7

Jr. was associated with the Patriarca Family while the defendant FRANCIS P. SALEMME was incarcerated.  When FRANCIS P. SALEMME became a Capo Regime, Salemme, Jr. was assigned to his father's "crew."

(i)  The defendant ROBERT P. DELUCA is a Soldier in the Patriarca Family.  DELUCA was inducted into the Patriarca Family at a ceremony on October 29, 1989 in Medford, Massachusetts. DELUCA has been a frequent companion of the defendant FRANCIS P. SALEMME since at least 1990.

(j)  The defendant JAMES M. MARTORANO is the brother of John Martorano.  The defendant JAMES M. MARTORANO was a member of the Winter Hill Gang during the 1970's.  He was incarcerated between approximately 1976 and 1982.  Upon MARTORANO's release from prison, he continued his association with the defendants BULGER and FLEMMI and their co-conspirator George Kaufman.  When the defendant FRANCIS P. SALEMME was released from prison in 1988, MARTORANO became closely associated with the defendant SALEMME.  MARTORANO subsequently was inducted into the Patriarca Family and was elevated to the position of Capo Regime in 1991. In 1991, MARTORANO participated in a scheme to engage in loansharking activity in Atlantic City, New Jersey with members and associates of the Genovese Family of La Cosa Nostra. MARTORANO engaged in this scheme pursuant to his participation in the affairs of the racketeering enterprise as described in

8

paragraph (k) below.

## THE RACKETEERING ENTERPRISE

(k)   At all times material to the allegations contained in this Indictment, in the District of Massachusetts and elsewhere, the defendants

FRANCIS P. SALEMME,
JAMES J. BULGER,
STEPHEN J. FLEMMI,
ROBERT P. DELUCA, and
JAMES M. MARTORANO,

together with other persons known and unknown to the grand jury, including John Martorano, George Kaufman, and Francis P. Salemme, Jr. did constitute an enterprise within the meaning of Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact which was engaged in various criminal activities, consisting of acts involving murder, gambling and extortion in violation of the laws of the Commonwealth of Massachusetts and gambling in violation of the laws of the State of Rhode Island; acts indictable under Title 18, United States Code, Section 1951 involving extortion; acts indictable under Title 18, United States Code, Sections 893 and 894 involving extortionate credit transactions; acts indictable under Title 18, United States Code, Section 1955 involving illegal gambling businesses; acts indictable under Title 18, United States Code, Section 1952 involving interstate travel in aid of racketeering enterprises; and acts indictable under Title 18, United States Code, Section 1512 involving tampering with

9

witnesses.  The individual members of the enterprise used their membership in and association with the Patriarca Family and the Winter Hill Gang to facilitate and to carry out their unlawful activities.

## THE RACKETEERING CONSPIRACY

2.    In or about and between approximately 1967 and January 1995, in the District of Massachusetts and elsewhere, the defendants

FRANCIS P. SALEMME,
JAMES J. BULGER,
STEPHEN J. FLEMMI,
ROBERT P. DELUCA, and
JAMES M. MARTORANO,

and others, known and unknown to the Grand Jury including John Martorano, George Kaufman, and Francis P. Salemme, Jr., being persons employed by and associated with the enterprise described in paragraph 1(k) of this Count, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree together with each other and with other persons known and unknown to the grand jury, to conduct and to participate, directly and indirectly, in the conduct of the affairs of the enterprise, which was engaged in and the activities of which affected interstate and foreign commerce, through a pattern of racketeering activity as set forth in paragraphs Twenty-four through Sixty-two of this Count and through the collection of unlawful debt as set forth in paragraph Sixty-three, in violation of Title 18, United States Code, Section 1962(d).

10

MANNER AND MEANS OF THE CONSPIRACY

3. It was a part of the conspiracy that the defendants and their co-conspirators would use violence and express and implicit threats of violence and of economic harm to exercise control over and obtain money from persons involved in various forms of legal and illegal activity.

4. It was a part of the conspiracy that the defendants and their co-conspirators coordinated their illicit activities in order to avoid conflict and to achieve their mutual goal of enriching themselves through the imposition of "street taxes" or "rent" on persons involved in various forms of legal and illegal activity. In this regard, disputes involving the defendants and their co-conspirators were routinely resolved through meetings known as "sit-downs."

5. During the 1960's, a "gang war" or "mob war" raged in the Greater Boston area. It was a part of the conspiracy that during this period, the defendants SALEMME, FLEMMI, JAMES MARTORANO, and John Martorano allied themselves with a "gang" in Somerville led by James "Buddy" McLean and Howard Winter. This Somerville gang was involved in a "war" with a Charlestown Gang led by George McLaughlin and his brothers, Bernie and Edward "Punchy" McLaughlin. The Somerville gang emerged victorious from this war and became known as the Winter Hill Gang.

11

6.   It was a part of the conspiracy that in or about and between 1967 and the present, individuals engaged in illegal gambling activities (hereinafter "bookmakers") were forced to associate themselves with, and make extortion payments known as "rent" to, members of the Patriarca Family in order to conduct their illegal gambling activities.  Those bookmakers who were not associated with members of the Patriarca Family and were "independent" were subject to physical and economic harm if they continued to engage in illegal gambling activities.

7.   It was also a part of the conspiracy that in or about and between 1970 and 1978, the Winter Hill Gang operated a sports bookmaking business.  During this period, members of the Winter Hill Gang forced certain independent bookmakers to associate themselves with the Winter Hill Gang's bookmaking operation, and thus to pay a percentage of their revenue to the Winter Hill Gang.

8.   After approximately 1978, certain independent bookmakers were required to make "rent" or extortion payments to members of the Winter Hill Gang in order to engage in illegal gambling activities.

9.   It was part of the conspiracy that members of the Patriarca Family and Winter Hill Gang exercised their influence over illegal gambling activities by adjudicating disputes between

12

bookmakers as well as between bookmakers and gamblers.  Members
of the Patriarca Family and the Winter Hill Gang used these
disputes as opportunities to extort money from bookmakers and
gamblers involved in these disputes.

10.  It was further part of the conspiracy that individuals
engaged in illegal lending activities (hereinafter "loansharks")
were forced to associate themselves with, and make extortion
payments known as "rent" to, members of the Patriarca Family or
Winter Hill Gang in order to conduct their illegal activities.
Those loansharks who were not associated with members of the
Patriarca Family or Winter Hill Gang were subject to physical and
economic harm if they continued to engage in illegal lending
activities.

11.  It was a part of the conspiracy that Joseph A. Yerardi,
Jr. of Newton, Massachusetts, was in the business of lending and
collecting money in violation of the laws of the Commonwealth of
Massachusetts and in violation of Sections 892 and 894 of Title
18 of the United States Code relating to extortionate credit
transactions.  Yerardi also operated an illegal gambling business
and engaged in illegal gambling activities in violation of Title
18, United States Code, Sections 1955, 1952, and 1084, and in
violation of Chapter 271, Sections 16A, 17, and 17A of the
General Laws of the Commonwealth of Massachusetts.  Yerardi made
"rent" or extortion payments to the Winter Hill Gang in order to

13

conduct his illegal activities.  Yerardi also collected "rent" or extortion payments from other individuals engaged in illegal gambling activities on behalf of the Winter Hill Gang.  Further, Yerardi's loansharking activities were financed, in part, by the Winter Hill Gang.

12.  It was part of the conspiracy that Peter J. Fiumara of Newton, Massachusetts owned and operated the Squire Lounge, an adult entertainment club located in Revere, Massachusetts. Fiumara was also in the business of lending and collecting money in violation of Sections 892 and 894 of Title 18 of the United States Code relating to extortionate credit transactions. Fiumara made "rent" or extortion payments to the defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. in order to conduct his illegal activities.  Fiumara also interacted with Yerardi regarding certain mutual loansharking business.

13.  It was part of the conspiracy that between 1978 and 1994 the Winter Hill Gang collected "rent" or extortion payments from numerous bookmakers in the Greater Boston area.  Among these bookmakers were the following:

> Burton L. Krantz,
> Edward Lewis,
> James J. Katz,
> Thomas Ryan,
> Howard Levenson,
> Richard Brown,
> Bernard Weisman
> Mitchell Zukoff, and
> Joseph A. Yerardi, Jr.

14

14.  It was part of the conspiracy that when the defendant FRANCIS P. SALEMME became the Boss of the Patriarca Family in approximately 1990, he sought to extend the conspiracy to collect extortion or "rent" payments into the Framingham, Massachusetts and Milford, Massachusetts areas.  He was assisted in this activity by Francis P. Salemme, Jr., Patriarca Family associate Thomas Hillary, as well as Framingham bookmaker John "Jack" Snell and others known to the grand jury.  It was also part of the conspiracy that at or about this time the defendant FRANCIS P. SALEMME also sought to extend the conspiracy to collect extortion or "rent" payments into the Lowell, Massachusetts area.  He was assisted in this activity by the defendant ROBERT P. DELUCA and Patriarca Family associates Charles "Chucky" Flynn and Albert "Pancho" Gonsalves.

15.  It was part of the conspiracy that the defendant FRANCIS P. SALEMME also conspired with others including Francis P. Salemme, Jr. and Patriarca Family associates Thomas Hillary and Steven DiSarro to engage in illegal gambling activities by placing video poker machines in establishments such as bars and restaurants where the machines would be used in an illegal manner.

16.  It was part of the conspiracy that the defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. sought to gain

15

control of Boston area "rent" collections traditionally controlled by several incarcerated Patriarca Family members including Capo Regime Vincent Ferrara and Soldier Angelo "Sonny" Mercurio, and collected "rent" from bookmakers Michael "the Frenchman" Dezotell and James Katz.

17.   It was part of the conspiracy that the defendant FRANCIS P. SALEMME coordinated the activities of the Patriarca Family with the activities of the Winter Hill Gang through the defendant STEPHEN J. FLEMMI and George Kaufman.

(a)   In this regard, the defendant FRANCIS P. SALEMME presided over a meeting or "sit-down" to resolve a dispute between Winter Hill controlled bookmaker Burton "Chico" Krantz and Patriarca Family controlled bookmaker Vincent "Fat Vinny" Roberto.   Present at this April 1990 meeting were the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, George Kaufman, Patriarca Family Consigliere Charles Quintina, Krantz and Roberto.

(b)   Similarly, the defendants FRANCIS P. SALEMME, STEPHEN J. FLEMMI, ROBERT P. DELUCA, JAMES M. MARTORANO and George Kaufman met in June 1991 to resolve a dispute between Patriarca Family controlled bookmaker Michael Dezotell and a Winter Hill Gang associated gambler named Kenneth Schiavo.

18.   It was further part of the conspiracy that certain individuals engaged in illegal narcotics trafficking (hereinafter

16

"drug dealers") were forced to associate themselves with, and make extortion payments known as "rent" to, members of the Patriarca Family or Winter Hill Gang in order to conduct their illegal activities.  Certain other drug dealers who were not associated with members of the Patriarca Family or Winter Hill Gang were subject to physical and economic harm if they continued to engage in illegal narcotics activities.

19.  It was part of the conspiracy that William David Lindholm was a drug dealer who was in the business of distributing large amounts of marijuana in violation of Title 21, United States Code, Section 846.  In or about and between approximately 1983 and 1991, Lindholm was forced to associate himself with, and pay "rent" to, the defendants BULGER, FLEMMI, and JAMES MARTORANO.  Lindholm was "taxed" at a specified rate per pound of marijuana distributed.  During this period, Lindholm distributed tens of thousands of pounds of marijuana, and paid the defendants BULGER, FLEMMI, and JAMES MARTORANO in excess of $500,000.

20.  In approximately 1981, a dispute arose between a Patriarca LCN Family associated drug dealer, Salvatore Michael Caruana, and a Winter Hill Gang associated drug dealer, Frank Lepere.  The dispute arose over a large load of marijuana that was distributed by an "unconnected" drug dealer.  Both Lepere and Caruana attempted to collect "rent" from this individual.

17

Ultimately, this dispute was resolved by payments to both the
Winter Hill and LCN factions.

21.  It was further part of the conspiracy that the Winter
Hill Gang controlled illegal activities in the South Boston
neighborhood of Boston primarily through the defendant JAMES J.
BULGER.  The defendant BULGER maintained a "crew" or group of
associates which operated in South Boston.  Some of the members
of this "crew" are known to the grand jury.  The defendant BULGER
and this "crew" required drug dealers to pay "rent" and to
purchase their drugs from sources designated by the defendant
BULGER.  In particular, during the early 1980's, BULGER collected
"rent" from a marijuana business operated by two drug dealers in
South Boston named Paul Moore and William Shea.  The defendant
BULGER, through a co-conspirator known to the grand jury, also
collected "rent" from a South Boston cocaine and loansharking
business operated by Moore and Moore's cousin John Cherry in the
late 1980's.

22.  It was part of the conspiracy, due to the national
nature of La Cosa Nostra and the regional jurisdiction of the
Patriarca Family, that the defendants FRANCIS P. SALEMME, ROBERT
P. DELUCA and JAMES M. MARTORANO and Francis P. Salemme, Jr.
travelled in interstate commerce and aided and abetted others to
so travel in furtherance of the criminal activities of the
Patriarca Family.  In particular,

18

(a)   the defendant ROBERT P. DELUCA, who resides in Lincoln, Rhode Island, travelled to Medford, Massachusetts in October 1989 to attend a La Cosa Nostra induction ceremony where DELUCA and three others were inducted into the Patriarca Family;

(b)   the defendants FRANCIS P. SALEMME and ROBERT P. DELUCA aided and abetted and caused the travel of a Gambino Family Capo Regime named Natale Richichi from Las Vegas, Nevada to Boston, Massachusetts in December 1991 to discuss, among other things, the structure and operation of the Patriarca Family in New England;

(c)   the defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. frequently travelled to Los Angeles, California and Las Vegas, Nevada during 1990 and 1991 in furtherance of a conspiracy to bribe union officials in Las Vegas and Boston; and

(d)   the defendant JAMES M. MARTORANO travelled to New York and New Jersey in October 1991 in furtherance of a scheme to finance illegal loansharking in Atlantic City, New Jersey.


23.   It was further part of the conspiracy that members of the Winter Hill Gang travelled in interstate commerce and used facilities in interstate commerce in furtherance of their illegal activities.   John Martorano participated in the affairs of the enterprise from outside the Commonwealth of Massachusetts while John Martorano was a fugitive and hiding in the state of Florida. When loanshark Joseph Yerardi fled the Commonwealth of Massachusetts in anticipation of his indictment by a federal

grand jury in 1993, Yerardi fled to Florida where he was assisted by John Martorano who aided and abetted Yerardi in the conduct of Yerardi's illegal activities while Yerardi was a fugitive and who took control of these illegal activities after Yerardi was apprehended in April 1994.

## PATTERN OF RACKETEERING ACTIVITY

24. <u>Racketeering Act #1</u>: From in or before January 1979, and continuing until in or about June 1994, in the District of Massachusetts and elsewhere, the defendants, FRANCIS P. SALEMME, JAMES J. BULGER, STEPHEN J. FLEMMI, ROBERT P. DELUCA and JAMES M. MARTORANO did conspire with each other and with other persons known and unknown to the Grand Jury including John Martorano, George Kaufman, and Francis P. Salemme, Jr., to obtain property, to wit, United States currency, from persons known and unknown to the Grand Jury, including, but not limited to the following individuals,

> Burton Krantz,
> Edward Lewis,
> Thomas Ryan,
> Richard Brown,
> Mitchell Zukoff,
> Howard Levenson,
> Joseph Yerardi,
> Bernard Weissman,
> James Katz,
> Michael Dezotell,
> Peter Fiumara,
> Albert Figaratto,
> William Lindholm,
> Paul Moore,
> William Shea,
> John Cherry, and
> Edmund Richardi,

20

who were engaged in unlawful activities, including illegal
gambling, illegal money lending, and illegal narcotics
trafficking, with their consent, which consent was induced by the
wrongful use of actual and threatened force, violence, and fear,
including indirect threats of physical harm, property damage, and
economic loss and to thereby obstruct, delay, and affect commerce
and the movement of any article in commerce in violation of Title
18, United States Code, Section 1951.

25.  _Racketeering Act #2_:  From in or about and between 1970
and 1979, in the District of Massachusetts and elsewhere, John
Martorano, aided and abetted by others known and unknown to the
grand jury, including the defendants JAMES J. BULGER, STEPHEN J.
FLEMMI, JAMES M. MARTORANO, and Howard T. Winter, did unlawfully,
wilfully, and knowingly conduct, finance, manage, supervise,
direct, and own all or part of an illegal gambling business, to
wit, a sports betting business, in violation of the laws of the
Commonwealth of Massachusetts in which said business was
conducted (Massachusetts General Laws, Chapter 271, Sections 7,
9, 16A, 17, 17A, 20, and 22), which illegal gambling business
involved five or more persons who conducted, financed, managed,
supervised, directed, and owned all or part thereof and remained
in substantially continuous operation in excess of thirty (30)
days and had a gross revenue of two thousand dollars ($2,000) in
a single day, in violation of Title 18, United States Code,
Sections 1955 and 2.

21

26. <u>Racketeering Act #3</u>: From in or about and between December 1973 and November 1975, in the District of Massachusetts and elsewhere, the defendants JAMES J. BULGER, STEPHEN J. FLEMMI, ROBERT J. DELUCA, and others, known and unknown to the grand jury, including Howard T. Winter, John Martorano, and James Martorano, did conspire, confederate and agree to willfully and knowingly carry into effect and attempt to carry into effect a scheme in commerce to influence by bribery sporting contests with knowledge that the purpose of this scheme was to influence by bribery those contests which involved pari-mutuel thoroughbred horse racing at the following race tracks: Suffolk Downs Race Track in East Boston, Massachusetts; Rockingham Race Track, Salem, New Hampshire; Lincoln Downs Race Track in Lincoln, Rhode Island; Pocono Race Track, Plains Township, Pennsylvania; Atlantic City Race Track, Hamilton Township, New Jersey; and Garden State Park, Cherry Hill, New Jersey, in violation of Title 18, United States Code, Section 224.

27. <u>Racketeering Act #4</u>: In approximately 1972 or 1973, in the District of Massachusetts, the defendant JAMES J. BULGER and other persons known and unknown to the Grand Jury, including Howard T. Winter and John Martorano, did knowingly and unlawfully obtain property, to wit, United States currency from Richard Wilgoren who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect

22

threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

28. <u>Racketeering Act #5</u>:  In approximately 1974, in the District of Massachusetts, the defendants JAMES J. BULGER and other persons known and unknown to the Grand Jury, including Howard T. Winter and John Martorano, did knowingly and unlawfully obtain property, to wit, United States currency from Burton L. Krantz who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

29. <u>Racketeering Act #6</u>:  Continuously between January 1979 and June 1992, in the District of Massachusetts, the defendants JAMES J. BULGER and STEPHEN J. FLEMMI and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Burton L. Krantz who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and

23

fear including indirect threats of physical harm, property

damage, and economic loss, and thereby did obstruct, delay, and

affect commerce and the movement of any article in commerce in

violation of Title 18, United States Code, Sections 1951 and 2.

30.  Racketeering Act #7:  Continuously between January 1978

and June 1992, in the District of Massachusetts, the defendants,

JAMES J. BULGER and STEPHEN J. FLEMMI and other persons known and

unknown to the Grand Jury, including George Kaufman, did

knowingly and unlawfully obtain property, to wit, United States

currency from Edward Lewis who was engaged in illegal gambling

activity, with his consent, which consent was induced by the

wrongful use of actual and threatened force, violence, and fear

including indirect threats of physical harm, property damage, and

economic loss, and thereby did obstruct, delay, and affect

commerce and the movement of any article in commerce in violation

of Title 18, United States Code, Sections 1951 and 2.

31.  Racketeering Act #8:  From in or before May 1991

through in or after December 1991, in the District of

Massachusetts, the defendants JAMES J. BULGER and STEPHEN J.

FLEMMI and other persons known and unknown to the Grand Jury,

including George Kaufman, did knowingly and unlawfully obtain

property, to wit, United States currency from Thomas Ryan who was

engaged in illegal gambling activity, with his consent, which

consent was induced by the wrongful use of actual and threatened

24

force, violence, and fear including indirect threats of physical

harm, property damage, and economic loss, and thereby did

obstruct, delay, and affect commerce and the movement of any

article in commerce in violation of Title 18, United States Code,

Sections 1951 and 2.


32.  <u>Racketeering Act #9</u>:  From in or before 1989 through in

or after June 1992, in the District of Massachusetts, the

defendants JAMES J. BULGER and STEPHEN J. FLEMMI, and other

persons known and unknown to the Grand Jury, including George

Kaufman, did knowingly and unlawfully obtain property, to wit,

United States currency from Richard Brown who was engaged in

illegal gambling activity, with his consent, which consent was

induced by the wrongful use of actual and threatened force,

violence, and fear including indirect threats of physical harm,

property damage, and economic loss, and thereby did obstruct,

delay, and affect commerce and the movement of any article in

commerce in violation of Title 18, United States Code, Sections

1951 and 2.


33.  <u>Racketeering Act #10</u>:  From in or before 1987 through

approximately May 1990, in the District of Massachusetts, the

defendants, JAMES J. BULGER and STEPHEN J. FLEMMI, and other

persons known and unknown to the Grand Jury, including George

Kaufman, did knowingly and unlawfully obtain property, to wit,

United States currency from Mitchell Zukoff who was engaged in

25

illegal gambling activity, with his consent, which consent was
induced by the wrongful use of actual and threatened force,
violence, and fear including indirect threats of physical harm,
property damage, and economic loss, and thereby did obstruct,
delay, and affect commerce and the movement of any article in
commerce in violation of Title 18, United States Code, Sections
1951 and 2.

34.  Racketeering Act #11:  From in or before the late
1980's through June 1993, in the District of Massachusetts, the
defendants, JAMES J. BULGER and STEPHEN J. FLEMMI, and other
persons known and unknown to the Grand Jury, including George
Kaufman, did knowingly and unlawfully obtain property, to wit,
United States currency from Howard Levenson who was engaged in
illegal gambling activity, with his consent, which consent was
induced by the wrongful use of actual and threatened force,
violence, and fear including indirect threats of physical harm,
property damage, and economic loss, and thereby did obstruct,
delay, and affect commerce and the movement of any article in
commerce in violation of Title 18, United States Code, Sections
1951 and 2.

35.  Racketeering Act #12:  From in or before 1986 through
in or after October 1993, in the District of Massachusetts, the
defendants, JAMES J. BULGER, STEPHEN J. FLEMMI, and FRANCIS P.
SALEMME, and other persons known and unknown to the Grand Jury,

including George Kaufman and Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, United States currency from Joseph A. Yerardi, Jr. who was engaged in illegal gambling and loansharking activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

36. Racketeering Act #13: Continuously between approximately September 1991 and April 1994, in the District of Massachusetts, the defendant FRANCIS P. SALEMME, and other persons known and unknown to the Grand Jury, including Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, United States currency from Peter Fiumara who was engaged in loansharking activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

37. The defendant FRANCIS P. SALEMME committed the

27

following acts relating to extortion, the commission of any one of which constitutes the commission of Racketeering Act 14.

(a) <u>Racketeering Act #14A</u>: Continuously between approximately June 1991 and December 1993, in the District of Massachusetts, the defendant FRANCIS P. SALEMME and other persons known and unknown to the Grand Jury, including Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, United States currency from Michael Dezotell who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

(b) <u>Racketeering Act #14B</u>: Continuously between approximately November 1992 and October 1994, in the District of Massachusetts, the defendant FRANCIS P. SALEMME, and other persons known and unknown to the Grand Jury, including Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, the use of a 1992 Ford Explorer from Michael Dezotell who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any

28

article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

38. _Racketeering Act #15_:  In or about and between approximately July and October 1990, in the District of Massachusetts, the defendants, FRANCIS P. SALEMME and STEPHEN J. FLEMMI, and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Burton Krantz and Vincent Roberto who were engaged in illegal gambling activity, with their consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

39. _Racketeering Act #16_:  In or about and between approximately 1989 and June 1992, in the District of Massachusetts, the defendants, FRANCIS P. SALEMME and ROBERT P. DELUCA and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Albert Figaratto who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats

29

of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

40.  Racketeering Act #17:  In or about and between approximately 1988 and June 1992, in the District of Massachusetts, the defendants, JAMES J. BULGER and STEPHEN J. FLEMMI, and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Bernard Weisman who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

41.  Racketeering Act #18:  Continuously between January 1985 and June 1993, in the District of Massachusetts, the defendants, JAMES J. BULGER and STEPHEN J. FLEMMI, and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from James J. Katz who was engaged in illegal gambling activity, with his consent, which consent was

30

induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce in violation of Title 18, United States Code, Sections 1951 and 2.

42. <u>Racketeering Act #19</u>:  In or about 1987, in the District of Massachusetts, the defendant JAMES M. MARTORANO did willfully advance money as a loan to Joseph A. Yerardi, Jr. with reasonable grounds to believe that it was the intention of Joseph A. Yerardi, Jr. to use the money so advanced directly and indirectly for the purpose of making extortionate extensions of credit within the meaning of Title 18, United States Code, Section 891(6), in violation of Title 18, United States Code, Section 893.

43. The defendants named below committed the following acts involving murder, the commission of any one of which constitutes the commission of Racketeering Act #20.

(a) <u>Racketeering Act #20A</u>:  On or about January 30, 1968, in the District of Massachusetts and elsewhere, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, did wilfully and unlawfully conspire together and with each other and with others known and unknown to the Grand Jury, including Ilario M.A. Zannino named herein as a co-conspirator but not as a defendant,

31

to commit an act involving murder, to wit, to assault and beat one John E. Fitzgerald, Jr. with the intent to murder him and to thereby kill and murder the said John E. Fitzgerald, Jr.

(b) <u>Racketeering Act #20B</u>:  On or about January 30, 1968, in the District of Massachusetts, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, did commit an act involving murder, that is, being armed with a dangerous weapon, did assault John E. Fitzgerald, Jr. with the intent to murder him in violation of Massachusetts General Laws Chapter 265, Section 18.

44. The defendants named below committed the following acts involving murder, the commission of any one of which constitutes the commission of Racketeering Act #21.

(a) <u>Racketeering Act #21A</u>:  In or about January of 1967, in the District of Massachusetts and elsewhere, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, did wilfully and unlawfully conspire together and with each other and with others known and unknown to the Grand Jury, including Ilario M.A. Zannino named herein as a co-conspirator but not as a defendant, to commit an act involving murder, to wit, to assault and beat one Edward "Wimpy" Bennett with the intent to murder him and to thereby kill and murder the said Edward "Wimpy" Bennett.

(b) <u>Racketeering Act #21B</u>:  In or about January of 1967, in the District of Massachusetts, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, did commit an act involving murder, that is, being armed with a dangerous weapon, did assault

32

Edward "Wimpy" Bennett with the intent to murder him, and by such assault did murder said Edward "Wimpy" Bennett in violation of Massachusetts General Laws Chapter 265, Section 1.

45.   The defendants named below committed the following acts involving murder, the commission of any one of which constitutes the commission of Racketeering Act #22.

(a)   Racketeering Act #22A:   In or about April of 1967, in the District of Massachusetts and elsewhere, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, did wilfully and unlawfully conspire together and with each other and with others known and unknown to the Grand Jury, including Ilario M.A. Zannino named herein as a co-conspirator but not as a defendant, to commit an act involving murder, to wit, to assault and beat one Walter Bennett with the intent to murder him and to thereby kill and murder the said Walter Bennett.

(b)   Racketeering Act #22B:   In or about April of 1967, in the District of Massachusetts, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, aided and abetted by others known and unknown to the grand jury, did commit an act involving murder, that is, being armed with a dangerous weapon, did assault Walter Bennett with the intent to murder him, and by such assault did murder said Walter Bennett in violation of Massachusetts General Laws Chapter 265, Section 1.

46.   The defendants named below committed the following acts

33

involving murder, the commission of any one of which constitutes the commission of Racketeering Act #23.

(a)  Racketeering Act #23A:  In or about December of 1967, in the District of Massachusetts and elsewhere, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, did wilfully and unlawfully conspire together and with each other and with others known and unknown to the Grand Jury, including Ilario M.A. Zannino named herein as a co-conspirator but not as a defendant, to commit an act involving murder, to wit, to assault and beat one William Bennett with the intent to murder him and to thereby kill and murder the said William Bennett.

(b)  Racketeering Act #23B:  On or about December 23, 1967, in the District of Massachusetts, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, aided and abetted by others known and unknown to the grand jury, did commit an act involving murder, that is, being armed with a dangerous weapon, did assault William Bennett with the intent to murder him, and by such assault did murder said William Bennett in violation of Massachusetts General Laws Chapter 265, Section 1.

47.  The defendants named below committed the following acts involving murder, the commission of any one of which constitutes the commission of Racketeering Act #24.

(a)  Racketeering Act #24A:  On or about December 23, 1967, in the District of Massachusetts and elsewhere, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, did wilfully

34

and unlawfully conspire together and with each other and with others known and unknown to the Grand Jury, to commit an act involving murder, to wit, to assault and beat one Richard Grasso with the intent to murder him and to thereby kill and murder the said Richard Grasso.

(b)  Racketeering Act #24B:  On or about December 23, 1967, in the District of Massachusetts, the defendants FRANCIS P. SALEMME and STEPHEN J. FLEMMI, aided and abetted by others known and unknown to the grand jury, did commit an act involving murder, that is, being armed with a dangerous weapon, did assault Richard Grasso with the intent to murder him, and by such assault did murder said Richard Grasso in violation of Massachusetts General Laws Chapter 265, Section 1.


48.  The defendant FRANCIS P. SALEMME committed the following acts relating to travel in aid of racketeering, the commission of any one of which constitutes the commission of Racketeering Act 25.

(a)  Racketeering Act #25A:  On or about April 17, 1990, in the District of Massachusetts and elsewhere, the defendant FRANCIS P. SALEMME did unlawfully, willfully, and knowingly travel in interstate commerce from Boston, Massachusetts to Los Angeles, California, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, bribery of officers and employees of labor organizations

in violation of Massachusetts General Laws, Chapter 271, Section 39, and Nevada Revised Statutes, Sections 614.140 and 614.150, and did thereafter perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of said unlawful activity in violation of Title 18, United States Code, Section 1952.

(b)  Racketeering Act #25B:  On or about May 1, 1990, the defendant FRANCIS P. SALEMME did unlawfully, willfully, and knowingly travel in interstate commerce from Los Angeles, California to Las Vegas, Nevada, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, bribery of officers and employees of labor organizations in violation of Massachusetts General Laws, Chapter 271, Section 39, and Nevada Revised Statutes, Sections 614.140 and 614.150, and did thereafter perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of said unlawful activity in violation of Title 18, United States Code, Section 1952.

(c)  Racketeering Act #25C:  On or about May 3, 1990, the defendant FRANCIS P. SALEMME did unlawfully, willfully, and knowingly travel in interstate commerce from Las Vegas, Nevada to Los Angeles, California, with intent to promote, manage, establish, carry on, and facilitate the promotion, management,

establishment, and carrying on of unlawful activity, namely,

bribery of officers and employees of labor organizations in

violation of Massachusetts General Laws, Chapter 271, Section 39,

and Nevada Revised Statutes, Sections 614.140 and 614.150, and

did thereafter perform and attempt to perform acts to promote,

manage, establish, carry on, and facilitate the promotion,

management, establishment and carrying on of said unlawful

activity in violation of Title 18, United States Code, Section

1952.


48. 49. <u>Racketeering Act #26</u>:  On or about October 29, 1989,

the defendant ROBERT P. DELUCA did unlawfully, wilfully, and

knowingly travel in interstate commerce between the State of

Rhode Island and the Commonwealth of Massachusetts, with intent

to promote, manage, establish, carry on, and facilitate the

promotion, management, establishment, and carrying on of unlawful

activity, to wit, (1) a business enterprise involving gambling in

violation of Massachusetts General Laws, Chapter 271, Sections 5,

7, 8, 9, 16A, 17, 17A, 20, and 22, and Title 18, United States

Code, Section 1955, and narcotics and controlled substances in

violation of Title 21, United States Code, Sections 841 and 846,

and (2) extortion in violation of Title 18, United States Code,

Sections 892, 894, and 1951, and thereafter did perform and

attempt to perform acts to promote, manage, establish, carry on,

and facilitate the promotion, management, establishment, and

carrying on of said unlawful activity in violation of Title 18,

37

United States Code, Sections 1952 and 2.

50.   The defendants named below committed the following acts relating to travel in aid of racketeering, the commission of any one of which constitutes the commission of Racketeering Act 27.

(a)   <u>Racketeering Act #27A</u>:  On or about December 11, 1991, the defendants FRANCIS P. SALEMME and ROBERT P. DELUCA did unlawfully, wilfully, and knowingly cause and aid and abet Natale Richichi to travel in interstate commerce between the State of Nevada and the Commonwealth of Massachusetts, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, to wit, (1) a business enterprise involving gambling in violation of Massachusetts General Laws, Chapter 271, Sections 5, 7, 8, 9, 16A, 17, 17A, 20, and 22, and Title 18, United States Code, Section 1955, and narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and (2) extortion in violation of Title 18, United States Code, Sections 892, 894, and 1951, and thereafter did perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity in violation of Title 18, United States Code, Section 1952 and 2.

(b)   <u>Racketeering Act #27B</u>:  On or about December 11, 1991, the defendant ROBERT P. DELUCA did unlawfully, wilfully, and knowingly travel in interstate commerce between the State of

38

Rhode Island and the Commonwealth of Massachusetts, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, to wit, (1) a business enterprise involving gambling in violation of Massachusetts General Laws, Chapter 271, Sections 5, 7, 8, 9, 16A, 17, 17A, 20, and 22, and Title 18, United States Code, Section 1955, and narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and (2) extortion in violation of Title 18, United States Code, Sections 892, 894, and 1951, and thereafter did perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity in violation of Title 18, United States Code, Section 1952.

51.   The defendant named below committed the following acts relating to witness tampering, the commission of any one of which constitutes the commission of Racketeering Act 28.

a.   <u>Racketeering Act #28A</u>:  In or about June 1993, in the District of Massachusetts, the defendant STEPHEN J. FLEMMI did corruptly persuade another person and attempt to do so and engage in misleading conduct toward another person known to the grand jury with intent to influence and prevent the testimony of that person in an official proceeding in that the defendant did suborn perjury and provide false and misleading information to James Katz who was a witness in an ongoing grand jury investigation of the defendants, in violation of Title 18, United

39

States Code, Section 1512.

b. <u>Racketeering Act #28B</u>: In or about June 1993, in the District of Massachusetts, the defendant STEPHEN J. FLEMMI did corruptly persuade another person and attempt to do so and engage in misleading conduct toward another person known to the grand jury with intent to influence and prevent the testimony of that person in an official proceeding in that the defendant did suborn perjury and provide false and misleading information to Howard Levenson who was a witness in an ongoing grand jury investigation of the defendants, in violation of Title 18, United States Code, Section 1512.

52. <u>Racketeering Act #29</u>: On or about October 10, 1991, the defendant JAMES M. MARTORANO did unlawfully, willfully, and knowingly travel in interstate commerce from Boston, Massachusetts to New York, New York, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, financing extortionate extensions of credit in violation of Title 18, United States Code, Section 893, and did thereafter perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity in violation of Title 18, United States Code, Section 1952.

53. <u>Racketeering Act #30</u>: In or about 1982, in the

40

District of Massachusetts, the defendant JAMES M. MARTORANO,

aided and abetted by others known and unknown to the grand jury,

made an extortionate extension of credit as defined by Title 18,

United States Code, Section 891(6) to James J. Katz in the amount

of approximately $15,000, with respect to which extension of

credit it was the understanding of the defendant creditor and the

debtor at the time it was made that delay in making repayment

could result in the use of violence and other criminal means to

cause harm to the person, reputation and property of James J.

Katz and others, in violation of Title 18, United States Code,

Sections 892(a) and 2.


54.  Racketeering Act #31:  In or about and between November

1992 and February 1993, in the District of Massachusetts and

elsewhere, the defendant ROBERT P. DELUCA and others, known and

unknown to the grand jury, did commit an act involving gambling,

that is, did knowingly conduct, finance, manage, supervise, and

own all or part of an organized criminal gambling business, as

defined in Section 11-51-1 of the Rhode Island General Laws,

1956, as amended (Reenactment of 1981), in violation of Sections

11-51-2 and 11-51-1 of the Rhode Island General Laws, 1956, as

amended (Reenactment of 1981).


55.  Racketeering Act #32:  On or about and between December

1, 1990 and April 30, 1991, in the District of Massachusetts, the

defendant ROBERT P. DELUCA and others, known and unknown to the

41

grand jury, did commit an act involving gambling, that is, did knowingly organize, supervise, manage and finance at least four persons so that such persons may provide facilities and services and assist in the provision of facilities and services for the conduct of illegal lotteries, and for the illegal registration of bets and the illegal buying and selling of pools upon the result of a trial and contest of skill, speed and endurance of man and beast, and upon the result of a game or competition, in violation of Chapter 271, Massachusetts General Laws, Section 16A.

56.  Racketeering Act #33:  In or about and between August 1989 and May 1991, in the District of Massachusetts, the defendants, JAMES J. BULGER and STEPHEN J. FLEMMI, and other persons known and unknown to the Grand Jury, did commit acts and threats involving extortion, that is, did, by a verbal communication, maliciously threaten an injury to the person of Timothy Connolly with intent thereby to extort a pecuniary advantage and with the intent to compel Timothy Connolly to do an act against his will in violation of Massachusetts General Laws, Chapter 265, Section 25.

57.  Racketeering Act #34:  In or about and between approximately January 1990 and August 1991, in the District of Massachusetts, the defendant FRANCIS P. SALEMME did knowingly aid and abet Joseph A. Yerardi, Jr., Peter J. Fiumara, and others known and unknown to the Grand Jury, in the use of extortionate

42

means to collect and attempt to collect extensions of credit made

to Steven Ferullo in the approximate aggregate amount of $21,000

in violation of Title 18, United States Code, Sections 894(a) and

2.

58. Racketeering Act #35: In or about and between 1983 and

February 1991, in the District of Massachusetts, the defendants,

JAMES J. BULGER, STEPHEN J. FLEMMI and JAMES M. MARTORANO,

and other persons known and unknown to the Grand Jury, did

knowingly and unlawfully obtain property, to wit, United States

currency from William D. Lindholm who was engaged in illegal

narcotics trafficking, with his consent, which consent was

induced by the wrongful use of actual and threatened force,

violence, and fear including indirect threats of physical harm,

property damage, and economic loss, and thereby did obstruct,

delay, and affect commerce and the movement of any article in

commerce in violation of Title 18, United States Code, Sections

1951 and 2.

59. Racketeering Act #36: In or about and between 1981 and

1983, in the District of Massachusetts, the defendants,

JAMES J. BULGER and STEPHEN J. FLEMMI, and other persons known

and unknown to the Grand Jury, did knowingly and unlawfully

obtain property, to wit, United States currency from Paul Moore

and William Shea who were engaged in illegal narcotics

trafficking, with their consent, which consent was induced by the

43

wrongful use of actual and threatened force, violence, and fear
including indirect threats of physical harm, property damage, and
economic loss, and thereby did obstruct, delay, and affect
commerce and the movement of any article in commerce in violation
of Title 18, United States Code, Sections 1951 and 2.

60.  Racketeering Act #37:  In or about and between 1987 and
1989, in the District of Massachusetts, the defendants, JAMES J.
BULGER and STEPHEN J. FLEMMI, and other persons known and unknown
to the Grand Jury, did knowingly and unlawfully obtain property,
to wit, United States currency from Paul Moore and John Cherry
who were engaged in illegal narcotics trafficking and
loansharking, with their consent, which consent was induced by
the wrongful use of actual and threatened force, violence, and
fear including indirect threats of physical harm, property
damage, and economic loss, and thereby did obstruct, delay, and
affect commerce and the movement of any article in commerce in
violation of Title 18, United States Code, Sections 1951 and 2.

61.  Racketeering Act #38:  In or about 1981, in the
District of Massachusetts, the defendants, JAMES J. BULGER and
STEPHEN J. FLEMMI, and other persons known and unknown to the
Grand Jury, did knowingly and unlawfully obtain property, to wit,
United States currency from Edmund Richardi who was engaged in
illegal narcotics trafficking, with his consent, which consent
was induced by the wrongful use of actual and threatened force,

44

violence, and fear including indirect threats of physical harm,

property damage, and economic loss, and thereby did obstruct,

delay, and affect commerce and the movement of any article in

commerce in violation of Title 18, United States Code, Sections

1951 and 2.


62. As set forth above in paragraphs Twenty-four through

Sixty-one, each defendant agreed to conduct and participate in

the conduct of the affairs of the enterprise through a pattern of

racketeering activity as follows:

a.   The defendant FRANCIS P. SALEMME agreed to conduct

and participate in the conduct of the affairs of the enterprise

by committing and agreeing to commit the following acts of

racketeering:

1.   Racketeering Acts 1, 12, 13, 14A, 14B, 15,

and 16 relating to interference with commerce by threats or

violence;

2.   Racketeering Acts 20A, 20B, 21A, 21B, 22A,

22B, 23A, 23B, 24A, and 24B relating to murder;

3.   Racketeering Acts 25A, 25B, 25C, and 27A

relating to interstate travel in aid of racketeering; and

4.   Racketeering Act 34 relating to extortionate

credit transactions.

b.   The defendant JAMES J. BULGER agreed to conduct

and participate in the conduct of the affairs of the enterprise

by committing and agreeing to commit the following acts of

45

racketeering:

        1.    Racketeering Acts 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 17, 18, 35, 36, 37, and 38 relating to interference with commerce by threats or violence;

        2.    Racketeering Act 2 relating to the prohibition of illegal gambling business;

        3.    Racketeering Act 3 relating to sports bribery; and

        4.    Racketeering Act 33 relating to extortion.

    c.    The defendant STEPHEN J. FLEMMI agreed to conduct and participate in the conduct of the affairs of the enterprise by committing and agreeing to commit the following acts of racketeering:

        1.    Racketeering Acts 1, 6, 7, 8, 9, 10, 11, 12, 15, 17, 18, 35, 36, 37, and 38 relating to interference with commerce by threats or violence;

        2.    Racketeering Act 2 relating to the prohibition of illegal gambling business;

        3.    Racketeering Act 3 relating to sports bribery;

        4.    Racketeering Acts 20A, 20B, 21A, 21B, 22A, 22B, 23A, 23B, 24A, and 24B relating to murder;

        5.    Racketeering Acts 28A and 28B relating to tampering with a witness, victim, or an informant; and

        6.    Racketeering Act 33 relating to extortion.

    d.    The defendant ROBERT P. DELUCA agreed to conduct

46

and participate in the conduct of the affairs of the enterprise by committing and agreeing to commit the following acts of racketeering:

      1.   Racketeering Acts 1 and 16 relating to interference with commerce by threats or violence;

      2.   Racketeering Act 3 relating to sports bribery;

      3.   Racketeering Acts 26, 27A, and 27B relating to interstate travel in aid of racketeering; and

      4.   Racketeering Acts 31 and 32 relating to the prohibition of illegal gambling business.

      e.   The defendant JAMES M. MARTORANO agreed to conduct and participate in the conduct of the affairs of the enterprise by committing and agreeing to commit the following acts of racketeering:

      1.   Racketeering Acts 1 and 35 relating to interference with commerce by threats or violence;

      2.   Racketeering Act 2 relating to the prohibition of illegal gambling business;

      3.   Racketeering Act 29 relating to interstate travel in aid of racketeering; and

      4.   Racketeering Acts 19 and 30 relating to extortionate credit transactions.

## COLLECTION OF UNLAWFUL DEBT

  63.  The defendant FRANCIS P. SALEMME agreed to conduct and

participate in the conduct of the affairs of this enterprise through the collection of unlawful debt. The collection of unlawful debt as defined by Title 18, United States Code, Section 1961(6), that is, a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States or the law of the Commonwealth of Massachusetts, or which was unenforceable in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States or the law of the Commonwealth of Massachusetts, or the business of lending money or a thing of value at a rate usurious under state or federal law, where the usurious rate was at least twice the enforceable rate, consisted of collecting and attempting to collect and aiding and abetting in the collection and attempted collection of usurious loans and illegal gambling debts as follows:

(a)   In or about and between January 1990 and August 1991, the defendant FRANCIS P. SALEMME and others known and unknown to the grand jury, including Joseph A. Yerardi, Jr., participated in the collection and attempted collection of unlawful usurious debts aggregating approximately $21,000 from Steven Ferullo.

All in violation of Title 18, United States Code, Section 1962(d).

48

<u>COUNT TWO</u>
(18 USC §1962(c))

1. Paragraphs One and Three through Twenty-three of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. In or about and between approximately 1967 and January 1995, in the District of Massachusetts and elsewhere, the defendants herein,

FRANCIS P. SALEMME,
JAMES J. BULGER,
STEPHEN J. FLEMMI,
ROBERT P. DELUCA, and
JAMES M. MARTORANO,

and others, known and unknown to the Grand Jury including John Martorano, George Kaufman, and Francis P. Salemme, Jr., being persons employed by and associated with the enterprise described in paragraph 1(k) of Count One, did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, which was engaged in and the activities of which affected interstate commerce, through a pattern of racketeering activity as particularly described in Paragraphs Twenty-four through Sixty-one of Count One, the contents of which are incorporated by reference as though fully set forth herein, and Paragraph Three of this Count, and through the collection of unlawful debt as particularly described in Paragraph Four of this Count.

49

3.   As set forth in paragraphs Twenty-four through Sixty-one of Count One, each defendant conducted and participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity as follows:

a.   The defendant FRANCIS P. SALEMME conducted and participated in the conduct of the affairs of the enterprise by committing the following acts of racketeering:

1.   Racketeering Acts 1, 12, 13, 14A, 14B, 15, and 16 relating to interference with commerce by threats or violence;

2.   Racketeering Acts 20A, 20B, 21A, 21B, 22A, 22B, 23A, 23B, 24A, and 24B relating to murder;

3.   Racketeering Acts 25A, 25B, 25C, and 27A relating to interstate travel in aid of racketeering; and

4.   Racketeering Act 34 relating to extortionate credit transactions.

b.   The defendant JAMES J. BULGER conducted and participated in the conduct of the affairs of the enterprise by committing the following acts of racketeering:

1.   Racketeering Acts 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 17, 18, 35, 36, 37, and 38 relating to interference with commerce by threats or violence;

2.   Racketeering Act 2 relating to the prohibition of illegal gambling business;

3.   Racketeering Act 3 relating to sports bribery; and

50

4.   Racketeering Act 33 relating to extortion.

c.   The defendant STEPHEN J. FLEMMI conducted and participated in the conduct of the affairs of the enterprise by committing the following acts of racketeering:

1.   Racketeering Acts 1, 6, 7, 8, 9, 10, 11, 12, 15, 17, 18, 35, 36, 37, and 38 relating to interference with commerce by threats or violence;

2.   Racketeering Act 2 relating to the prohibition of illegal gambling business;

3.   Racketeering Act 3 relating to sports bribery;

4.   Racketeering Acts 20A, 20B, 21A, 21B, 22A, 22B, 23A, 23B, 24A, and 24B relating to murder;

5.   Racketeering Acts 28A and 28B relating to tampering with a witness, victim, or an informant; and

6.   Racketeering Act 33 relating to extortion.

d.   The defendant ROBERT P. DELUCA conducted and participated in the conduct of the affairs of the enterprise by committing the following acts of racketeering:

1.   Racketeering Acts 1 and 16 relating to interference with commerce by threats or violence;

2.   Racketeering Act 3 relating to sports bribery;

3.   Racketeering Acts 26, 27A, and 27B relating to interstate travel in aid of racketeering; and

4.   Racketeering Acts 31 and 32 relating to the

51

prohibition of illegal gambling business.

       e.   The defendant JAMES M. MARTORANO conducted and participated in the conduct of the affairs of the enterprise by committing the following acts of racketeering:

       1.   Racketeering Acts 1 and 35 relating to interference with commerce by threats or violence;

       2.   Racketeering Act 2 relating to the prohibition of illegal gambling business;

       3.   Racketeering Act 29 relating to interstate travel in aid of racketeering; and

       4.   Racketeering Acts 19 and 30 relating to extortionate credit transactions.

    4.   The defendant FRANCIS P. SALEMME conducted and participated in the conduct of the affairs of this enterprise through the collection of unlawful debt. The collection of unlawful debt as defined by Title 18, United States Code, Section 1961(6), that is, a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States or the law of the Commonwealth of Massachusetts, or which was unenforceable in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States or the law of the Commonwealth of Massachusetts, or the business of lending money or a thing of value at a rate usurious under state or federal law, where the

usurious rate was at least twice the enforceable rate, consisted of collecting and attempting to collect and aiding and abetting in the collection and attempted collection of usurious loans and illegal gambling debts as follows:

(a)  In or about and between January 1990 and August 1991, the defendant FRANCIS P. SALEMME and others known and unknown to the grand jury, including Joseph A. Yerardi, Jr., participated in the collection and attempted collection of unlawful usurious debts aggregating approximately $21,000 from Steven Ferullo.


All in violation of Title 18, United States Code, Section 1962(c) and Section 2.

53

## COUNT THREE
### (18 USC §1951)

From in or before January 1979, and continuing until in or

about June 1994, in the District of Massachusetts and elsewhere,

the defendants,

FRANCIS P. SALEMME,
JAMES J. BULGER,
STEPHEN J. FLEMMI,
ROBERT P. DELUCA, and
JAMES M. MARTORANO,

did conspire with each other and with other persons known and

unknown to the Grand Jury, including John Martorano, George

Kaufman, and Francis P. Salemme, Jr., to obtain property, to wit,

United States currency, from persons known and unknown to the

Grand Jury, including, but not limited to the following

individuals,

Burton Krantz,
Edward Lewis,
Thomas Ryan,
Richard Brown,
Mitchell Zukoff,
Howard Levenson,
Joseph Yerardi,
Bernard Weissman,
James Katz,
Michael Dezotell,
Peter Fiumara,
Albert Figaratto,
William Lindholm,
Paul Moore,
William Shea,
John Cherry, and
Edmund Richardi,

who were engaged in unlawful activities, including illegal

gambling, illegal money lending, and illegal narcotics

trafficking, with their consent, which consent was induced by the

wrongful use of actual and threatened force, violence, and fear,

54

including indirect threats of physical harm, property damage, and economic loss and to thereby obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Section 1951.

55

<u>COUNT FOUR</u>
(18 U.S.C. §§1951 and 2)

Continuously between January 1979 and June 1992, in the District of Massachusetts, the defendants,

JAMES J. BULGER, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Burton L. Krantz who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

56

COUNT FIVE
(18 U.S.C. §§1951 and 2)

Continuously between January 1985 and June 1993, in the

District of Massachusetts, the defendants,

JAMES J. BULGER, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including

George Kaufman, did knowingly and unlawfully obtain property, to

wit, United States currency from James J. Katz who was engaged in

illegal gambling activity, with his consent, which consent was

induced by the wrongful use of actual and threatened force,

violence, and fear including indirect threats of physical harm,

property damage, and economic loss, and thereby did obstruct,

delay, and affect commerce and the movement of any article in

commerce.


All in violation of Title 18, United States Code, Sections

1951 and 2.

<u>COUNT SIX</u>
(18 U.S.C. §§1951 and 2)

Continuously between January 1978 and June 1992, in the District of Massachusetts, the defendants,

JAMES J. BULGER, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Edward Lewis who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

58

<u>COUNT SEVEN</u>
(18 U.S.C. §§1951 and 2)

Continuously between May and December 1991, in the District of Massachusetts, the defendants,

JAMES J. BULGER, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Thomas Ryan who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

59

<u>COUNT EIGHT</u>
(18 U.S.C. §§1951 and 2)

From in or before 1989 through June 1992, in the District of Massachusetts, the defendants,

JAMES J. BULGER, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Richard Brown who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

60

<u>COUNT NINE</u>
(18 U.S.C. §§1951 and 2)

From in or before 1987 through approximately May 1990, in the District of Massachusetts, the defendants,

JAMES J. BULGER, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Mitchell Zukoff who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

61

<u>COUNT TEN</u>
(18 U.S.C. §§1951 and 2)

From in or before the late 1980's through June 1993, in the District of Massachusetts, the defendants,

JAMES J. BULGER, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Howard Levenson who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

62

COUNT ELEVEN
(18 U.S.C. §§1951 and 2)

From in or before 1986 through in or after October 1993, in the District of Massachusetts, the defendants,

JAMES J. BULGER,
STEPHEN J. FLEMMI, and
FRANCIS P. SALEMME,

and other persons known and unknown to the Grand Jury, including George Kaufman and Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, United States currency from Joseph A. Yerardi, Jr. who was engaged in illegal gambling and loansharking activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

63

## COUNT TWELVE
### (18 U.S.C. §§1951 and 2)

Continuously between approximately September 1991 and April 1994, in the District of Massachusetts, the defendant, FRANCIS P. SALEMME, and other persons known and unknown to the Grand Jury, including Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, United States currency from Peter Fiumara who was engaged in loansharking activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

64

## COUNT THIRTEEN
(18 U.S.C. §§1951 and 2)

Continuously between approximately June 1991 and December 1993, in the District of Massachusetts, the defendant, FRANCIS P. SALEMME, and other persons known and unknown to the Grand Jury, including Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, United States currency from Michael Dezotell who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

65

COUNT FOURTEEN
(18 U.S.C. §§1951 and 2)

Continuously between approximately November 1992 and October 1994, in the District of Massachusetts, the defendant, FRANCIS P. SALEMME, and other persons known and unknown to the Grand Jury, including Francis P. Salemme, Jr., did knowingly and unlawfully obtain property, to wit, the use of a 1992 Ford Explorer from Michael Dezotell who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

66

<u>COUNT FIFTEEN</u>
(18 U.S.C. §§1951 and 2)

In or about and between approximately July and October 1990,

in the District of Massachusetts, the defendants,

FRANCIS P. SALEMME, and
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including

George Kaufman, did knowingly and unlawfully obtain property, to

wit, United States currency from Burton Krantz and Vincent

Roberto who were engaged in illegal gambling activity, with their

consent, which consent was induced by the wrongful use of actual

and threatened force, violence, and fear including indirect

threats of physical harm, property damage, and economic loss, and

thereby did obstruct, delay, and affect commerce and the movement

of any article in commerce.

All in violation of Title 18, United States Code, Sections

1951 and 2.

67

COUNT SIXTEEN
(18 U.S.C. §§1951 and 2)

In or about and between approximately 1989 and June 1992, in the District of Massachusetts, the defendants,

FRANCIS P. SALEMME, and
ROBERT P. DELUCA,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Albert Figaratto who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

68

<u>COUNT SEVENTEEN</u>
(18 USC §§1951 and 2)

In or about and between approximately 1988 and June 1992, in the District of Massachusetts, the defendants,

JAMES J. BULGER,
STEPHEN J. FLEMMI,

and other persons known and unknown to the Grand Jury, including George Kaufman, did knowingly and unlawfully obtain property, to wit, United States currency from Bernard Weisman who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

69

## COUNT EIGHTEEN
(18 USC §§1951 & 2)

In or about and between 1983 and February 1991, in the District of Massachusetts, the defendants,

JAMES J. BULGER,
STEPHEN J. FLEMMI, and
JAMES M. MARTORANO,

and other persons known and unknown to the Grand Jury, did knowingly and unlawfully obtain property, to wit, United States currency from William D. Lindholm, who was engaged in illegal narcotics trafficking, with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections 1951 and 2.

70

<u>COUNT NINETEEN</u>
(18 USC §371)

1.   At times material to the allegations contained in this Count:

(a)   The International Brotherhood of Teamsters (hereinafter "IBT"), through its affiliated locals, did represent and would admit to membership persons who were employed by various companies involved in the film industry throughout the United States. As such, IBT and each related "local" was a labor organization engaged in an industry affecting commerce, within the meaning of Sections 141, 152, and 186 of Title 29 of the United States Code.

(b)   IBT Local 25 was located in Charlestown, Massachusetts and was the largest IBT local in New England. William McCarthy was President of IBT Local 25 as well as International President and Vice-President.   James Moar was Vice-President of IBT Local 25.

(c)   William Winn was a member of IBT Local 25 and was a close associate of James Moar and William McCarthy.   William Winn was also a "transportation captain" who supervised other IBT members employed by film companies in the New England region.

(d)   IBT Local 995 was located in Las Vegas, Nevada. Dick Thomas was Secretary-Treasurer of IBT Local 995.

(e)   The International Alliance of Theatrical and Stage Employees (hereinafter "IATSE"), through its affiliated locals, did represent and would admit to membership persons who were

71

employed by various companies involved in the film industry throughout the United States.  As such, IATSE and each related "local" was a labor organization engaged in an industry affecting commerce, within the meaning of Sections 141, 152, and 186 of Title 29 of the United States Code.

(f)  IATSE Local 720 was located in Las Vegas, Nevada. Ron Mich'l was business representative of IATSE Local 720. Michael Procia was International Vice-President of IATSE.

(g)  Dennis Lepore was a "soldier" or "made" member of the Patriarca Family assigned to the defendant FRANCIS P. SALEMME's regime or "crew."

(h)  Thomas Hillary was an associate of the Patriarca Family assigned to the defendant FRANCIS P. SALEMME's regime or "crew."   Hillary had close ties to Raymond J. Patriarca.

(i)  David Rudder Productions was a film company located in Santa Monica, California.  In truth and fact, this company was part of an undercover operation conducted by the Federal Bureau of Investigation.  The principal of David Rudder Productions was David Rudder, an undercover agent employed by the Federal Bureau of Investigation.


2.   Continuously between approximately March 1989 and June 1990, in the District of Massachusetts and elsewhere, the defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. did combine, conspire, confederate, and agree with others known and unknown to the Grand Jury including Dennis Lepore, Thomas

72

Hillary, and William Winn to unlawfully pay and deliver money in excess of $1,000 to union officials and union employees on behalf of David Rudder Productions (1) under circumstances in which said individuals were officers and employees of labor organizations which represented, sought to represent, and would admit to membership the employees of David Rudder Productions and (2) with intent to influence said union officials and union employees in respect to their actions, decisions, and duties as representatives of employees and as officers and employees of a labor organization in violation of Title 29, United States Code, Sections 186 (a)(2), (a)(4), and (b)(1).

## METHODS AND MEANS OF THE CONSPIRACY

3.   It was a part of the conspiracy that the defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. and their coconspirators used their influence with James Moar and William Winn to obtain a "sweetheart agreement" for David Rudder Productions which allowed David Rudder Productions to make a film without the employment of IBT members in Boston, Massachusetts and Providence, Rhode Island.

4.   It was further a part of the conspiracy that money in excess of $1,000 was paid by Francis P. Salemme, Jr. to James Moar in order to gain this "sweetheart agreement" at a time when James Moar was Vice-President of IBT Local 25.

73

5.   It was further a part of the conspiracy that money was paid by David Rudder to the defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. and their coconspirators in return for their services to David Rudder Productions.

6.   It was further a part of the conspiracy that James Moar spoke with John Amaral, President and business agent of IBT Local 251 in East Providence, Rhode Island, and instructed Amaral to permit David Rudder Productions to film in Providence without the employment of IBT members.

7.   It was further a part of the conspiracy that William Winn consented to James Moar's agreement which permitted David Rudder Productions to film a movie without the employment of IBT members in Boston, Massachusetts and Providence, Rhode Island knowing that Francis P. Salemme, Jr. intended to pay money in excess of $1,000 to James Moar.

8.   It was further a part of the conspiracy that William Winn agreed to assist the defendant and the other coconspirators to obtain a similar "sweetheart agreement" for David Rudder Productions with IBT Local 995 in Las Vegas, Nevada knowing that Francis P. Salemme, Jr. intended to pay money to an IBT union official in order to accomplish this goal.

9.   It was further a part of the conspiracy that William

74

Winn and Francis P. Salemme, Jr. represented David Rudder
Productions in a meeting with IBT Local 995 Secretary-Treasurer
Dick Thomas in Las Vegas, Nevada.

10.  It was further a part of the conspiracy that Francis P.
Salemme, Jr. represented David Rudder Productions in several
meetings with IATSE Local 720 business representative Ron Mich'l
in Las Vegas, Nevada.

11.  It was further a part of the conspiracy that Francis P.
Salemme, Jr. stated that he represented David Rudder Productions
in a meeting with IATSE International Vice-President Michael
Procia in New York, New York.

12.  It was further a part of the conspiracy that the
defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. met with
Gambino Crime Family Capo Regime Natale Richichi in Las Vegas,
Nevada in order to further the ends of the conspiracy.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects
thereof, the defendant committed and caused to be committed, in
the District of Massachusetts and elsewhere, the following overt
acts, among others;

1.  On or about June 20, 1989, Dennis Lepore and Thomas
Hillary met with David Rudder at the Venezia Restaurant in Boston

75

Massachusetts.

2.   On or about June 23, 1989, Dennis Lepore and Thomas Hillary met with David Rudder at the Marriot Hotel in Cambridge, Massachusetts.

3.   On or about August 8, 1989, Dennis Lepore travelled from Boston, Massachusetts to Santa Monica, California and met with David Rudder at the business office of David Rudder Productions.

4.   On or about August 23, 1989, Dennis Lepore received $5,000 from David Rudder in Santa Monica, California.

5.   On or about September 6, 1989, Francis P. Salemme, Jr. and Thomas Hillary met with David Rudder at the Charles Hotel in Cambridge, Massachusetts.

6.   On or about September 8, 1989, Thomas Hillary and William Winn met with James Moar and David Rudder at the Charles Hotel in Cambridge, Massachusetts.

7.   On or about September 17, 1989, Francis P. Salemme, Jr. and Thomas Hillary travelled from Boston, Massachusetts to Las Vegas, Nevada and met with David Rudder.

8.   On or about September 25, 1989, Francis P. Salemme, Jr. and Thomas Hillary travelled from Boston, Massachusetts to Providence, Rhode Island and met with David Rudder.

9.   On or about September 26, 1989, Francis P. Salemme, Jr. met with John Amaral and David Rudder in Warwick, Rhode Island.

10.  On or about December 6, 1989, Francis P. Salemme, Jr., Thomas Hillary, and William Winn travelled from Boston,

76

Massachusetts to Las Vegas, Nevada and met with David Rudder.

11.  On or about December 8, 1989, Francis P. Salemme, Jr. received $5,000 from David Rudder in Las Vegas, Nevada.

12.  On or about January 9, 1990, Francis P. Salemme, Jr. travelled from Boston, Massachusetts to New York, New York and met with David Rudder.

13.  On or about February 1, 1990, Francis P. Salemme, Jr. met with David Rudder in Providence, Rhode Island.

14.  On or about February 1, 1990, Francis P. Salemme, Jr. received $5,000 from David Rudder in Providence, Rhode Island.

15.  On or about February 26, 1990, Francis P. Salemme, Jr. received $1,000 from David Rudder in Santa Monica, California.

16.  On or about March 7, 1990, Francis P. Salemme, Jr. and William Winn met with David Rudder in Las Vegas, Nevada.

17.  On or about May 1, 1990 the defendant FRANCIS P. SALEMME and Francis P. Salemme, Jr. travelled from Los Angeles, California to Las Vegas, Nevada and met with Natale Richichi.

18.  On or about May 10, 1990, Francis P. Salemme, Jr. met with David Rudder in Las Vegas, Nevada.

19.  On or about May 22, 1990, Francis P. Salemme, Jr. met with David Rudder in Santa Monica, California.

20.  On or about June 7, 1990, Francis P. Salemme, Jr. received $5,000 from David Rudder at the Golden Nugget Hotel in Las Vegas, Nevada.

All in violation of Title 18, United States Code, Section 371.

COUNT TWENTY
(18 U.S.C. §1952)

On or about April 17, 1990, in the District of Massachusetts and elsewhere, the defendant FRANCIS P. SALEMME did unlawfully, willfully, and knowingly travel in interstate commerce from Boston, Massachusetts to Los Angeles, California, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, bribery of officers and employees of labor organizations in violation of Massachusetts General Laws, Chapter 271, Section 39, and Nevada Revised Statutes, Sections 614.140 and 614.150, and did thereafter perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of said unlawful activity.

All in violation of Title 18, United States Code, Section 1952.

COUNT TWENTY-ONE
(18 U.S.C. §1952)

On or about May 1, 1990, the defendant FRANCIS P. SALEMME did unlawfully, willfully, and knowingly travel in interstate commerce from Los Angeles, California to Las Vegas, Nevada, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, bribery of officers and employees of labor organizations in violation of Massachusetts General Laws, Chapter 271, Section 39, and Nevada Revised Statutes, Sections 614.140 and 614.150, and did thereafter perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of said unlawful activity.

All in violation of Title 18, United States Code, Section 1952.

79

<u>COUNT TWENTY-TWO</u>
(18 U.S.C. §1952)

On or about May 3, 1990, the defendant FRANCIS P. SALEMME did unlawfully, willfully, and knowingly travel in interstate commerce from Las Vegas, Nevada to Los Angeles, California, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, bribery of officers and employees of labor organizations in violation of Massachusetts General Laws, Chapter 271, Section 39, and Nevada Revised Statutes, Sections 614.140 and 614.150, and did thereafter perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of said unlawful activity.

All in violation of Title 18, United States Code, Section 1952.

COUNT TWENTY-THREE
(18 U.S.C. §371)

1.   On or about October 29, 1989, in the District of
Massachusetts and elsewhere, the defendant ROBERT P. DELUCA
did knowingly and intentionally combine, conspire, confederate,
and agree with others known and unknown to the Grand Jury, to
violate Title 18, United States Code, Section 1952.


2.   It was part of said conspiracy that the defendant and
his co-conspirators travelled and caused travel to occur in
interstate and foreign commerce to promote, manage, establish,
carry on, and facilitate the promotion, management,
establishment, and carrying on of unlawful activity, said
unlawful activity involving (1) a business enterprise involving
gambling in violation of Title 18, United States Code, Section
1955, and narcotics and controlled substances in violation of
Title 21, United States Code, Sections 841 and 846, and (2)
extortion in violation of Title 18, United States Code, Sections
892, 894, and 1951, and that said defendants thereafter performed
and attempted to perform acts to promote, manage, establish,
carry on, and facilitate the promotion, management,
establishment, and carrying on of said unlawful activity.


3.   It was further part of said conspiracy that the
defendant was about to become a member of a secret criminal
organization identified and known as the Patriarca Family of La

81

Cosa Nostra which was a business enterprise involving gambling, narcotics, and extortion. Said organization had as its head or Boss Raymond J. Patriarca who resided in Rhode Island. Members and associates of the Patriarca Family of La Cosa Nostra resided in the States of Connecticut, Rhode Island, and New Hampshire and in the Commonwealth of Massachusetts.

4. It was further part of said conspiracy that on October 29, 1989, certain of the co-conspirators travelled in interstate commerce for the purpose of attending a meeting to establish the chain-of-command and hierarchy of the Family, to induct four new members into the Family, and to instruct the new members as to the hierarchy of the organization and as to the rules governing their conduct of its illegal gambling, loansharking, and narcotics activities.

5. In furtherance of the conspiracy and to effect the objects thereof, the defendant and his co-conspirators committed the following overt acts in the District of Massachusetts and elsewhere:

(a) On October 29, 1989, Raymond J. Patriarca, Matthew L. Guglielmetti, Jr., Pasquale Galea, and the defendant ROBERT DELUCA travelled from the State of Rhode Island to Medford in the Commonwealth of Massachusetts.

(b) On October 29, 1989, Carmen A. Tortora, Vincent Federico, Richard J. E. Floramo, and the defendant ROBERT P.

82

DELUCA were inducted as Soldiers of the Patriarca Family at a ceremony presided over by Raymond J. Patriarca and attended by seventeen members of the Patriarca Family from the States of Rhode Island and Connecticut and the Commonwealth of Massachusetts.

(c)  On October 29, 1989, Biagio DiGiacomo formally opened the induction ceremony by stating in Italian, "In Honor of the Family, the Family is open."

(d)  On October 29, 1989, Carmen A. Tortora, Vincent Federico, Richard J. E. Floramo, and the defendant ROBERT P. DELUCA, who were inducted into the Patriarca Family, received instructions concerning the rules of La Cosa Nostra and agreed in the presence of all other members to kill any individual who posed a threat to the organization and its members.

(e)  On October 29, 1989, Biagio DiGiacomo stated to Carmen Tortora, "Carmen, we're going to baptize you again.  You were baptized when you were a baby, your parents did it, but now this time we gonna baptize you."

(f)  On October 29, 1989, Biagio DiGiacomo administered the following oaths (in Italian) to each of the four inductees:

> I ... want to enter into this organization to protect
> my Family and to protect all my Friends.  ... I swear
> not to divulge this secret and to obey, with love and
> Omerta.

After this first oath the trigger finger of each inductee was cut to draw blood for use in the ritual.  A holy card with the image of the Patriarca Family Saint was then burned as DiGiacomo administered the second oath:

83

> As burns this Saint so will burn my soul.  I enter
> alive into this organization and I will have to get out
> dead.

    (g)  On October 29, 1989, DiGiacomo explained to each

inductee the commitment to the organization and its secrecy

required of him:

> We get in alive in this organization and the only way
> we gonna get out is dead no matter what.  It's no hope,
> no Jesus, no Madonna, nobody can help us if we ever
> give up this secret to anybody, any kinds of friends of
> mine, let's say.  This Thing that cannot be exposed.

    All in violation of Title 18, United States Code, Section

371.

84

<u>COUNT TWENTY-FOUR</u>
(18 U.S.C. §§1952 and 2)

On or about October 29, 1989, the defendant ROBERT P. DELUCA did unlawfully, wilfully, and knowingly travel in interstate commerce between the State of Rhode Island and the Commonwealth of Massachusetts, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, to wit, (1) a business enterprise involving gambling in violation of Massachusetts General Laws, Chapter 271, Sections 5, 7, 8, 9, 16A, 17, 20, and 22, and Title 18, United States Code, Section 1955, and narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and (2) extortion in violation of Title 18, United States Code, Sections 892, 894, and 1951, and thereafter did perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity.

All in violation of Title 18, United States Code, Sections 1952 and 2.

85

<u>COUNT TWENTY-FIVE</u>
(18 U.S.C. §§1952 and 2)

On or about December 11, 1991, the defendants FRANCIS P. SALEMME and ROBERT P. DELUCA did unlawfully, wilfully, and knowingly cause and aid and abet Natale Richichi to travel in interstate commerce between the State of Nevada and the Commonwealth of Massachusetts, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, to wit, (1) a business enterprise involving gambling in violation of Massachusetts General Laws, Chapter 271, Sections 5, 7, 8, 9, 16A, 17, 20, and 22, and Title 18, United States Code, Section 1955, and narcotics and controlled substances in violation of Title 21, United States Code, Sections 841 and 846, and (2) extortion in violation of Title 18, United States Code, Sections 892, 894, and 1951, and thereafter did perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity.

All in violation of Title 18, United States Code, Sections 1952 and 2.

86

COUNT TWENTY-SIX
(18 USC §1952)

On or about December 11, 1991, the defendant ROBERT P.
DELUCA did unlawfully, wilfully, and knowingly travel in
interstate commerce between the State of Rhode Island and the
Commonwealth of Massachusetts, with intent to promote, manage,
establish, carry on, and facilitate the promotion, management,
establishment, and carrying on of unlawful activity, to wit, (1)
a business enterprise involving gambling in violation of
Massachusetts General Laws, Chapter 271, Sections 5, 7, 8, 9,
16A, 17, 17A, 20, and 22, and Title 18, United States Code,
Section 1955, and narcotics and controlled substances in
violation of Title 21, United States Code, Sections 841 and 846,
and (2) extortion in violation of Title 18, United States Code,
Sections 892, 894, and 1951, and thereafter did perform and
attempt to perform acts to promote, manage, establish, carry on,
and facilitate the promotion, management, establishment, and
carrying on of said unlawful activity.

All in violation of Title 18, United States Code, Section
1952.

87

## COUNT TWENTY-SEVEN
### (18 USC §§894 and 2)

In or about and between approximately January 1990 and August 1991, in the District of Massachusetts, the defendant FRANCIS P. SALEMME did knowingly aid and abet Joseph A. Yerardi, Jr., Peter J. Fiumara, and others known and unknown to the Grand Jury, in the use of extortionate means to collect and attempt to collect extensions of credit made to Steven Ferullo in the approximate aggregate amount of $21,000.

All in violation of Title 18, United States Code, Sections 894(a) and 2.

88

COUNT TWENTY-EIGHT
(18 USC §1512)

In or about June 1993, in the District of Massachusetts, the defendant STEPHEN J. FLEMMI did corruptly persuade another person and attempt to do so and engage in misleading conduct toward another person known to the grand jury with intent to influence and prevent the testimony of that person in an official proceeding, i.e., a grand jury proceeding, in that the defendant did suborn perjury and provide false and misleading information to James Katz who was a witness in said ongoing grand jury investigation of the defendants.

In violation of Title 18, United States Code, Section 1512.

89

COUNT TWENTY-NINE
(18 USC §1512)

In or about June 1993, in the District of Massachusetts, the defendant STEPHEN J. FLEMMI did corruptly persuade another person and attempt to do so and engage in misleading conduct toward another person known to the grand jury with intent to influence and prevent the testimony of that person in an official proceeding, i.e., a grand jury proceeding, in that the defendant did suborn perjury and provide false and misleading information to Howard Levenson who was a witness in said ongoing grand jury investigation of the defendants.

In violation of Title 18, United States Code, Section 1512.

90

RACKETEERING FORFEITURE ALLEGATIONS

1.   The allegations of Counts One and Two of this indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 1963.

2.   As a result of the offenses in violation of Title 18, United States Code, Section 1962, set forth in Counts One and Two of this indictment, the defendants,

FRANCIS P. SALEMME,<br>
JAMES J. BULGER,<br>
STEPHEN J. FLEMMI,<br>
ROBERT P. DELUCA, and<br>
JAMES M. MARTORANO,

shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 1963(a):

(i) all interests the defendants have acquired and maintained in violation of Title 18, United States Code, Section 1962, wherever located, and in whatever names held;

(ii) all interests in, securities of, claims against, and properties and contractual rights of any kind affording a source of influence over, any enterprise which the defendants have established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

(iii) all property constituting, and derived from, any proceeds which the defendants obtained, directly and indirectly, from racketeering activity and unlawful debt collection in

91

violation of Title 18, United States Code, Section 1962.

3.   If any of the property described in paragraph 2 hereof as being forfeitable pursuant to Title 18, United States Code, Section 1963, as a result of any act and omission of the defendants --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred to, sold to, or deposited with a third party;

c.   has been placed beyond the jurisdiction of this Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of all other property of the defendants up to the value of the property listed in subparagraphs a through e hereof.

All pursuant to Title 18, United States Code, Section 1963.

92

A TRUE BILL

_Deputy_ Foreperson of the Grand Jury

Assistant United States Attorney

DISTRICT OF MASSACHUSETTS;_____ 7-2 _____1996

Returned into the District Court by the Grand Jurors and filed.

Deputy Clerk